IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN RE: | CASE NO. BK05-8_____ |
| ACCEPTANCE INSURANCE COMPANIES INC., | Chapter 11 |
| Debtor. | **DECLARATION OF JOHN E. MARTIN IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS** |

JOHN E. MARTIN deposes and states as follows:

1. I am the Chief Executive Officer of Acceptance Insurance Companies Inc., a Delaware corporation ("Debtor"), the debtor and debtor-in-possession in the above captioned Chapter 11 case. I am authorized to submit this affidavit (the "Affidavit") on behalf of the Debtor.

2. I joined the Debtor on December 14, 1999 as Chief Executive Officer. In 1970 I received a BA degree in Agronomy from the University of Nebraska at Lincoln and in 1971 I received an MBA from the University of Nebraska at Lincoln.

3. On January 7, 2004 (the "Petition Date"), the Debtor filed a petition for reorganization relief under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Nebraska. The Debtor intends to continue to manage and operate its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee, examiner, or creditors' committee has been appointed in the Debtor's case.

4. In addition to filing Chapter 11 petition on the Petition Date, the Debtor filed various "first day" applications and motions (collectively, the "First Day Motions") seeking relief designed to enable the Debtor to minimize the adverse effects of the Chapter 11 filing on

01-651515.3

its business.

5. I submit this Affidavit in support of the Debtor's Chapter 11 petition and the First Day Motions.[1] Except as otherwise stated, all facts set forth in this Affidavit are based on my personal knowledge, my discussions with other members of the Debtor's senior management and boards of directors, my review of relevant documents, or my opinion, based on my experience with and knowledge of the Debtor's operations and financial condition. If I were called upon to testify, I could and would testify competently to the statements set forth herein.

6. Part I of this Affidavit describes the Debtor's business and the circumstances surrounding the commencement of its Chapter 11 case. Part II of this Affidavit sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

## PART I—BACKGROUND

**A.** **The Debtor's Businesses**

*Formation*

7. The Debtor was incorporated in Ohio as National Fast Food Corp. in 1968, reincorporated in Delaware in 1969 and thereafter operated under the names NFF Corp. (1971 to 1973), Orange-co, Inc. (1973 to 1987), Stoneridge Resources, Inc. (1987 to 1992), and was renamed Acceptance Insurance Companies Inc. in 1992.

*Overview*

8. The Debtor is an insurance holding company. The Debtor's primary assets consist of its insurance company subsidiary, Acceptance Insurance Company ("AIC"), cash and cash equivalents held at the holding company level and a cause of action against the United State of America pending in the United States Court of Federal Claims.

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the relevant First Day Motion.

9. As of November 30, 2004 the Debtor had $2,816,446 in cash and cash equivalents. The Debtor also holds a surplus note for $20 million issued by AIC, bearing interest at the rate of 9% per annum payable quarterly (the "AIC Surplus Note"). AIC is currently under the supervision of the Nebraska Department of Insurance ("NEDOI"), and therefore the Debtor does not expect to receive any payments of principal or interest from AIC on the AIC Surplus Note as these payments would require approval of the NEDOI.

10. The Debtor historically underwrote its insurance products through AIC and its formerly owned subsidiaries, American Growers Insurance Company ("AGIC"),[2] Acceptance Casualty Insurance Company, Acceptance Indemnity Insurance Company, Phoenix Indemnity Insurance Company and Redland Insurance Company. The Debtor's Agricultural Segment insurance operations were primarily conducted by AGIC and the Property and Casualty Segment insurance operations were primarily conducted by the other insurance company subsidiaries.

*Debentures*

11. In August 1997, AICI Capital Trust, a Delaware business trust organized by the Debtor (the "Issuer Trust") issued 3.795 million shares or $94.875 million aggregate liquidation amount of its 9% Preferred Securities (liquidation amount $25 per Preferred Security). The Debtor owns all of the common securities (the "Common Securities") of the Issuer Trust. The Preferred Securities represent preferred undivided beneficial interests in the Issuer Trust's assets. The assets of the Issuer Trust consist solely of debentures issued by the Debtor in August 1997 (the "Debentures") in an amount equal to the total of the Preferred Securities and the Common Securities and are due in 2027.

---

[2] AGIC is the subject of a rehabilitation proceeding pending in the District Court for Lancaster County, Nebraska and the Debtor has not had control of AGIC or AGIC's subsidiaries since the institution of that proceeding.

12. Distributions on the Preferred Securities and Debentures are cumulative, accrue from the date of issuance and are payable quarterly in arrears. The Debentures are subject to certain events of default and can be called at par value after September 30, 2002, all as described in the Indenture entered into in connection with the issuance of the Debentures (the "Indenture"). As of November 30, 2004, the Debtor had Debentures of $115,059,998 outstanding at an interest rate of 9%.

13. Effective November 18, 2002, the Debtor elected to defer payment of interest on its Debentures, as permitted by the Indenture, beginning with the interest payment date on December 31, 2002 until not later than September 30, 2007. The interest payments on the Preferred Securities are deferred for a corresponding period.

*Insurance Operations*

14. The principal lines of AIC primarily consist of general liability, commercial property, commercial casualty, inland marine and workers' compensation coverages.

15. AIC announced several strategic decisions over the last several years which have significantly impacted its Property and Casualty business. During 1999, AIC ceased or reduced its underwriting in several product lines. In September 1999, AIC sold its nonstandard automobile business, including Phoenix Indemnity Insurance Company. In the first quarter of 2000, AIC transferred the renewal rights to all business previously produced and serviced by AIC's Scottsdale, Arizona office and its "long haul" trucking business. The Debtor sold its wholly owned insurance subsidiary, Redland Insurance Company, to Clarendon National Insurance Company effective as of July 1, 2000. During 2001, AIC ceased writing or sold all remaining property and casualty business. Additionally, in 2001, as part of a strategy to exit the property and casualty business, AIC sold its wholly owned insurance subsidiary, Acceptance

Indemnity Insurance Company, and the Debtor sold Acceptance Casualty Insurance Company, a wholly owned subsidiary of the Debtor.

16.     The principal lines of AGIC consisted of Multi-Peril Crop Insurance ("MPCI"), supplemental coverages and named peril insurance. MPCI is a federally subsidized insurance program designed to encourage agricultural producers to manage their risk through the purchase of insurance policies. MPCI provides agricultural producers with yield coverage for crop damage from substantially all natural perils. Crop Revenue Coverage ("CRC") is an extension of the MPCI program that provides agricultural producers primarily with protection from revenue loss caused by changes in crop prices, low yields, or a combination of the two. As used herein, the term MPCI includes CRC, unless the context indicates otherwise. For the crop year ended December 31, 2003, AGIC had no MPCI Gross Premiums.

17.     The largest named peril crop insurance product offered by AGIC was crop hail insurance which insures growing crops against damage resulting from hailstorms. AGIC also sold a small volume of insurance against damage to specific crops from other named perils. None of the named peril products involve federal reinsurance or price subsidy participation. For the crop year ended December 31, 2003, AGIC had no gross premium from named peril crop insurance, including crop hail.

**B.      Events Leading to Chapter 11 Case**

19.     The Director of the NEDOI (the "Director") entered an administrative Order of Supervision with respect to AIC on December 20, 2002 and AIC currently is operating pursuant to that Order. Under the Order of Supervision, AIC is required to pay all costs incurred by its Supervisor, AIC may not accept or renew any insurance business and may not perform any activities beyond those that are routine in the day-to-day conduct of its runoff business without

prior approval of the Director or Supervisor. The Director currently has the authority to increase regulatory control of AIC by requesting an appropriate court to enter an Order of Rehabilitation or an Order of Liquidation, with or without a change in the financial condition of AIC.

20. The National Association of Insurance Commissioners has established risk-based capital ("RBC") standards. RBC standards are designed to measure the acceptable level of capital an insurer should have, based on the inherent and specific risks of each insurer. As of November 30, 2004, AIC had negative statutory surplus, resulting in a RBC at the mandatory control level. Under the mandatory control level, the NEDOI may take such actions as necessary to place AIC under regulatory control under the Nebraska Insurers Supervision, Rehabilitation, and Liquidation Act. Since AIC is currently in run-off, the Director is permitted to allow AIC to continue its run-off under supervision of the NEDOI.

21. The Debtor continues to manage the run-off of AIC. The Debtor expects future AIC net premiums earned to be minimal and be primarily comprised of adjustments related to audits and endorsements for policies expiring in 2002 and prior years.

22. AGIC's results for 2002 and prior years were significantly impacted by its crop business, particularly its MPCI line. The underwriting earnings or loss for the MPCI business was generally comprised of the Federal Crop Insurance Corporation ("FCIC") profit share net of the amounts ceded to private reinsurers, expenses in excess of MPCI reimbursements from the FCIC, and amortization expense for non-competition and other agreements. Additionally, MPCI underwriting results included any adjustments to prior year MPCI results.

23. Many parts of the country experienced drought and abnormal growing conditions that significantly impacted the amount of losses under 2002 MPCI policies issued by AGIC. These MPCI losses impacted AGIC's share of profit it received from or loss it paid to the FCIC

under the profit sharing formula established by law and administered by the RMA. Because of the extraordinary reported and expected volume and severity of crop insurance claims in 2002, AGIC recorded a loss from crop insurance underwriting and operations for the year ended December 31, 2002 of approximately $87.3 million.

24. On November 18, 2002 AGIC announced that it signed a non-binding letter of intent setting forth the preliminary terms for AGIC's potential sale of certain crop insurance assets to Rain and Hail L.L.C. ("Rain and Hail"). On November 25, 2002 Rain and Hail announced "termination of further negotiations under the previously announced Non-Binding Letter of Intent because RMA (USDA Risk Management Agency) would not allow the transaction as set forth in the terms of the non-binding letter of intent."

25. Subsequent to the RMA and Rain and Hail actions, the operations of AGIC were discontinued and the company was placed in rehabilitation by the District Court of Lancaster County, Nebraska. In rehabilitation, AGIC and its subsidiaries ceased to be under the control of AICI.

26. Additionally, the Debtor expensed its current and future obligations under a multi-year reinsurance agreement totaling $27.5 million. During 2002, the Debtor determined that the intangible asset related to non-competition agreements, approximately $5.7 million, and the goodwill carried on the books of the Debtor at approximately $30.0 million were impaired and written down to zero.

## PART II—FIRST DAY MOTIONS

27. To effectuate their successful reorganizations, the Debtor is filing concurrently herewith various First Day Motions. I have reviewed each of the First Day Motions (including the exhibits thereto) and can attest to the truth of the facts set forth therein. Moreover, I believe

that the relief sought in each of the First Day Motions (i) is vital to enable the Debtor to make the transition to, and operate in, Chapter 11 with a minimum of disruption to its business and (ii) constitutes a critical element in achieving the Debtor's successful reorganization. For purposes hereof, any reference to the "Motion" shall refer to the particular First Day Motion under the heading for which such term is used.

**A.     Motion for Order Authorizing Employment and Retention of Professionals in Ordinary Course of Business.**

28.     The Debtor customarily retained the services of certain professionals to render services relating to the conduct of the Debtor's ordinary business affairs. The Debtor expect that it will continue to require the services of the Ordinary Course Professionals identified on Exhibit A to the Motion and may require the services of other professionals if they are to continue normal business activities during their reorganization efforts.

29.     The Debtor believes that it would unduly hinder the administration of the Debtor's estate if the Debtor were required to submit to the Court an application for employment filed in accordance with Local Bankruptcy Rule 2014-1 and proposed retention order for each Ordinary Course Professional and wait until such order is approved before such Ordinary Course Professional continued to render services.

30.     The Debtor believes that the retention of the Ordinary Course Professionals on the basis set forth in the Motion is in the best interests of the Debtor's estates. The Debtor understands that the Ordinary Course Professionals generally wish to represent the Debtor on an ongoing basis. The Debtor does not believe that the Ordinary Course Professionals listed on Exhibit A to the Motion have an interest adverse to the Debtor, its estates, creditors, or other parties-in-interest with respect to the matters for which they are to be retained.

**B.     Motion for Standing Order Limiting Notice.**

31. There are over three thousand creditors and parties in interest in this case. In cases of this magnitude, the Court, creditors and parties in interest are better served by having established notice and motion procedures in place at the commencement of the proceedings. Such procedures will afford appropriate notice to those parties involved in the proceedings, yet not require that the Debtor or creditors spend unnecessary costs and fees for service when filing pleadings with the Court. Providing notice of every matter filed herein to every creditor would be a burdensome expense and a waste of the Debtor's assets.

[Remainder of page left intentionally blank]

I DECLARE UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746 THAT THE ABOVE AND FOREGOING IS TRUE AND CORRECT.

Dated this 7th day of January, 2005.

/s John E. Martin
John E. Martin