# United States Bankruptcy Appellate Panel
**FOR THE EIGHTH CIRCUIT**

———

Nos. 07-6027/6029

———

| | |
|---|---|
| In re: | * |
| | * |
| Acceptance Insurance Companies Inc., | * |
| | * |
|     Debtor. | * |
| _____ | * |
| | * |
| Granite Reinsurance Company Ltd., | * |
| | * |
|     Plaintiff–Appellant | * |
|         –Cross-Appellee, | * |
| | * |
| v. | * |
| | * |
| Acceptance Insurance Companies, Inc., | * |
| | * |
|     Debtor–Appellee | * |
|         –Cross-Appellant. | * |
| _____ | * |
| | *   Appeals from the United States |
| Granite Reinsurance Company Ltd., | *   Bankruptcy Court for the |
| | *   District of Nebraska |
|     Plaintiff–Appellant | * |
|         –Cross-Appellee, | * |
| | * |
| v. | * |
| | * |
| Acceptance Insurance Company, a Nebraska Corporation, | * |
| | * |
|     Defendant–Appellee | * |
|         –Cross-Appellant. | * |

|  | * |
| --- | --- |
| _____ | * |
| Acceptance Insurance Companies, Inc., | * |
|  | * |
| Plaintiff–Appellant, | * |
|  | * |
| v. | * |
|  | * |
| Granite Reinsurance Company Ltd., | * |
|  | * |
| Defendant–Appellee. | * |

Submitted: February 13, 2008
Filed: March 12, 2008

Before KRESSEL, Chief Judge, SCHERMER and VENTERS, Bankruptcy Judges.

KRESSEL, Chief Judge.

The appeals and cross-appeals in these cases involve a reinsurance contract between several companies in the crop insurance business and an off-shore reinsurance company. We affirm the bankruptcy court's judgment that the debtor's subsidiaries were parties to the reinsurance contract and that the debtor was not entitled to the return of $6 million in premiums that it had paid. We reverse the bankruptcy court's judgment that the reinsurance company was not entitled to receive the balance of its $15 million premium.

**BACKGROUND**

The debtor, Acceptance Insurance Companies, Inc., is a Delaware corporation with its principal place of business in Iowa. It is the parent company of Acceptance Insurance Company, a Nebraska corporation whose principal place of business is in

Iowa, and of American Growers Insurance Company, a Nebraska corporation. The debtor is an insurance holding company that is not a licensed insurer and does not issue insurance policies. Acceptance is primarily a property and casualty insurance company that sometimes issues crop insurance. American Growers is exclusively a crop insurance company. Granite Reinsurance Company, Ltd. is a Barbados corporation with its principal place of business in Bermuda. IGF Insurance Company is a crop insurance company whose parent company is Goran Capital. Alan Symons was or is an executive of Granite Re, IGF Insurance Company, and Goran Capital.

In 1999 and 2000, IGF sustained major losses due to a poor growing season in California. Because of these losses, the Federal Crop Insurance Corporation advised IGF that unless it put $30 to $40 million into its crop insurance business, the FCIC would not allow IGF to continue to write crop insurance in 2001. Therefore, IGF made plans to sell its crop insurance business to the debtor.

On May 23, 2001, the debtor, Acceptance, American Growers, and American Agrisurance, Inc., entered into an asset purchase agreement with Goran Capital Inc., Symons International Group, Inc., IGF Holdings, Inc., and IGF Insurance Company. The agreement was signed by John Martin on behalf of the debtor and Symons on behalf of Goran Capital, Symons International Group, Inc., IGF Holdings, Inc., and IGF Insurance Company. The agreement stated that it was "entered into by and among ACCEPTANCE INSURANCE COMPANIES, INC. . . . for itself and on behalf of ACCEPTANCE INSURANCE COMPANY, . . . AMERICAN GROWERS INSURANCE COMPANY, . . . and AMERICAN AGRISURANCE INC." It also stated that it was a valid and binding agreement which was enforceable against the debtor, Acceptance, American Growers, and American Agrisurance.

The asset purchase agreement anticipated the execution of several ancillary agreements. One of the ancillary agreements was the MPCI[1] Stop Loss Reinsurance Contract. The purpose of the reinsurance contract was to reinsure the debtor's subsidiaries' multi-peril crop insurance policies in order to gain the FCIC's approval for the transaction. Of the debtor's subsidiaries, America Growers was primarily responsible for MPCI policies, although Acceptance wrote MPCI policies in states in which America Growers was not licensed to do business. The preamble of the reinsurance contract provided that:

> In consideration of the mutual covenants hereinafter contained and subject to all the terms and conditions herinafter set forth, GRANITE REINSURANCE COMPANY, LTD, do [sic] hereby indemnify, as herein provided, ACCEPTANCE INSURANCE COMPANIES INC. Wherever the word "Company" is used in this Contract, such term shall be held to include any and/or all of the subsidiary companies which are or may hereafter come under the management of the Company, provided that notice be given to the Reinsurer of any such subsidiary companies which may hereafter come under the management of the Company as soon as practicable.

The contract term ran from July 1, 2000 to June 30, 2005.[2] Under the reinsurance contract, the debtor would pay $15 million over the five-year term of the contract with at least $6 million due at signing, nothing due the next year, and at least $3 million due each year for the remaining three years. The text of the contract which refers to the premium states: "The Company [the debtor and its subsidiaries] will pay the Reinsurer [Granite Re] a minimum and deposit premium of $6,000,000 at the

---

[1] MPCI stands for multi-peril crop insurance, which insures against weather-related crop losses and other unavoidable perils.

[2] The actual text of the contract reads, "[t]his Contract shall become effective as of July 1, 2000 and shall remain in full force and effect with respect to all Covered Business risks in force or attaching from that date through June 30, 2005."

4

signing of this treaty for the crop year[3] 2001 and 2002 and shall pay a minimum deposit premium of $3,000,000 on January 1, 2003, a minimum deposit of $3,000,000 on January 1, 2004, and a minimum deposit of $3,000,000 on January 1, 2005."

In return for its payment, Granite Re reinsured the debtor's subsidiaries losses on their MPCI policies at the 140%-150% loss level, up to $40 Million, and provided an additional $9 Million in legacy coverage for any past claims. The contract defined Granite Re's obligation: "[Granite Re] shall be liable for 100% of the subject ultimate net loss in excess of. . .140% but not greater than 150% of the Company's subject net retained premium income for each crop year." The term "subject ultimate net loss" was defined as the "subject net retained premium on business the subject of this Contract, classified by the Company as MPCI." The contract separately defined the term "subject net retained premium income" as "the net retained premium on Covered Business the subject of this Contract, classified by the Company as MPCI."

On May 29, 2001, Alan Symons, the President and Chief Executive Officer of Goran and the person who negotiated the reinsurance contract between the debtor and Granite Re, sent a letter to the Indiana Department of Insurance which stated "[Granite Re] will reinsure $40 million of risk for MPIC layer 140% to 150% for five years. . . .[Granite Re] will be paid $3,000,000 per year for the duration of the risk. [Five year maximum]." On June 4, 2001, Acceptance ratified the asset purchase agreement and the ancillary agreements.

In June of 2001 the debtor paid Granite Re $6 million of the $15 million reinsurance premium. Due to significant financial losses, on December 20, 2002, American Growers was placed in statutory rehabilitation. On February 28, 2005, it was placed in statutory liquidation. American Growers ceased issuing insurance policies upon the entry of the order for supervision. The Nebraska Department of

---

[3]Crop years run from July to July. For instance crop year 2001 runs from July 1, 2000 to July 1, 2001.

Insurance also placed Acceptance under supervision on December 20, 2002, but it is not currently in receivership. Acceptance stopped writing insurance in the fourth quarter of 2001, except for a few small policies which were issued in 2002. Because Acceptance and American Growers did not write significant insurance business after 2001, and therefore had minimal risk of insurance losses, the debtor did not pay Granite Re the remaining $9 million premium on the reinsurance contract.

On January 7, 2005, the debtor filed its chapter 11 petition in the District of Nebraska.[4] Granite Re filed a proof of claim on May 6, 2005 for approximately $10.9 million, which was the balance of the premium due under the reinsurance contract plus interest. The debtor objected on the basis that the reinsurance premium was due on an annual basis for coverage received in that year. Because it could no longer issue crop insurance policies, the debtor contended that it no longer needed reinsurance coverage and was not obligated to continue making payments under the contract.

On September 22, 2005, Granite Re filed a complaint against Acceptance in the U.S. District Court for the District of Nebraska which sought $9 million in unpaid reinsurance premiums plus interest. Acceptance contended that it was not a party to the reinsurance contract, and was thus not liable for the premium. The parties stipulated to removal and on January 23, 2006 the district court referred this proceeding to the bankruptcy court.[5] Granite Re, Acceptance and the debtor jointly made a motion to consolidate the claim objection and the lawsuit. The bankruptcy court granted the motion.

On October 26, 2006, the debtor brought a complaint against Granite Re that sought return of the $6 million it had paid to Granite Re for reinsurance coverage.[6]

---

[4]Case number 05-80059.

[5]Adversary proceeding number 06-08015.

[6]Adversary proceeding number 06-8115.

The complaint alleged that the reinsurance contract lacked consideration because the definition of "subject ultimate net loss" as the "subject net retained premium" made it impossible that the subject ultimate net loss could equal more than 100% of the subject net retained premium because the two terms were equivalent. The parties moved to consolidate this proceeding with the other two. The bankruptcy court granted the motion and consolidated all three proceedings on December 5, 2006.

On December 31, 2006, the debtor and Acceptance filed a motion for summary judgment. Granite Re resisted the motion. On February 15, 2007, the bankruptcy court denied the motion.

The bankruptcy court held a trial on February 27-28, 2007. On May 9, 2007, the bankruptcy court held that the debtor, Acceptance, American Growers and Granite Re were all parties to the reinsurance contract. The court further held that Acceptance and the debtor were not responsible for the $9 million balance owed on the reinsurance contract because the premium was due on an annual basis and only in the years in which the debtor faced potential losses in its MPCI insurance business. Because the debtor and its subsidiaries did not require coverage beyond the first two years of the contract, they asserted that they were under no obligation to continue making payments on the contract. Therefore, the bankruptcy court entered judgment in favor of Acceptance in adversary proceeding number 06-08015. Granite Re appealed and Acceptance cross-appealed this judgment. On the basis of these same findings, the bankruptcy court sustained the debtor's objection to Granite Re's claim in bankruptcy case number 05-80059. Granite Re appealed and the debtor cross-appealed this judgment. Finally, the court found that Granite Re was entitled to retain the initial $6 million premium payment because the reinsurance contract did not lack consideration. The court entered judgment for Granite Re in adversary proceeding number 06-08115 and dismissed the debtor's complaint. The debtor appealed from this judgment.

## Standard of Review

We review the bankruptcy court's factual findings for clear error and its conclusions of law de novo. *Debold v. Case*, 452 F.3d 756, 761 (8th Cir. 2006); *In Re Vondall,* 364 B.R. 668, 670 (B.A.P. 8th Cir. 2007). "To the extent a court's construction of a contract relies on the contract terms and not on extrinsic evidence, its interpretation is a conclusion of law over which we have plenary review." *Frank B. Hall & Co. v. Alexander & Alexander, Inc.,* 974 F.2d 1020, 1023 (8th Cir. 1992). To the extent that the meaning of the contract depends on disputed extrinsic evidence, it constitutes a finding of fact, which is subject to review on appeal under the clearly erroneous standard. *Towers Hotel Corp. v. Rimmel*, 871 F.2d 766, 771-72 (8th Cir. 1989). The determination of whether a contract is ambiguous is a question of law that we review de novo. *Papio Keno Club, Inc. v. City of Papillion (In re Papio Keno Club, Inc.),* 262 F.3d 725, 731 (8th Cir. 2001). The asset purchase agreement stipulates that Iowa law applies to any dispute arising out of it or the ancillary agreements, and the parties do not dispute that Iowa law applies.

## DISCUSSION

### The Reinsurance Contract Is Enforceable Against the Debtor.

The duty of a court when interpreting a contract is to give effect to the intention of the parties. *Iowa National Mutual Ins. Co. v. Fidelity and Casualty Co. of New York,* 128 N.W. 2d 891, 893 (Iowa 1964). To do this, the court should construe the contract as a whole and give the unambiguous language its plain meaning. *Id.* No part should be assumed to be superfluous. The interpretation that gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation that leaves a portion of the agreement of no effect. *Smith Barney, Inc. v. Keeney*, 570 N.W.2d 75, 78 (Iowa 1997).

Ambiguity may be said to appear when, after application of certain rules of interpretation to the face of the instrument, a genuine uncertainty results as to which one of two or more meanings is the proper one. *Iowa Fuel & Minerals, Inc. v. Iowa State Board of Regents*, 471 N.W.2d 859, 862-63 (Iowa 1991). If the language is found to be ambiguous, extrinsic evidence is admissible as an aid of interpretation of the contract. *Dickson v. Hubble Realty Co.*, 567 N.W.2d 427, 430 (Iowa 1997).

When we look to the contract in its entirety, we agree with the bankruptcy court that it is clear that the parties intended the contract to provide legacy reinsurance coverage and coverage at the 140% to 150% loss level. Neither party intended the contract provide no coverage. Although the definition of "subject ultimate net loss" as the "subject net retained premium on business the subject of this Contract" is confusing, we conclude that this is the result of careless drafting rather than an intent by the parties to create a meaningless contract. The parties most likely meant to define "subject ultimate net loss" as "the *ultimate net loss* on business the subject of this Contract, classified by the Company as MPCI" because "subject net retained premium income" was defined as "the net retained premium on Covered Business the subject of this Contract, classified by the Company as MPCI." We doubt that the parties intended "subject ultimate net loss" and "subject net retained premium" to have virtually identical definitions, especially because the plain meaning of the words "net loss" and "net retained" are antonymic. The best interpretation of the contract is one that reflects the obvious intentions of the parties and gives a reasonable, lawful meaning to the entire contract. Because the contract read in its entirety indicates that the parties intended the reinsurance contract to have consideration, and an interpretation to that effect gives the contract a more reasonable meaning, we conclude that the contract did not lack consideration.

Although we conclude that the contract on its face is unambiguous, and therefore there is no need to consider extrinsic evidence, we think that the extrinsic evidence reveals that the parties intended to provide consideration for the contract.

Representatives from both the debtor and Granite Re testified that they intended the contract to provide reinsurance coverage, and the conduct of both parties is consistent with the belief that the contract provided coverage. In addition, the debtor could not have intended the contract to lack enforceability or it would have been in violation of federal crop insurance regulations which require reinsurance coverage. Thus, we can find no evidence that the parties intended the contract to be void for lack of consideration and we affirm the bankruptcy court's decision on this issue.

### **The Reinsurance Contract Is Enforceable Against Acceptance.**

We also agree with the bankruptcy court that Acceptance is a party to the MPCI reinsurance contract and is liable for its premium. Under the contract, the term "Company" refers to the debtor and to all of the debtor's subsidiaries–present and future. At the time the reinsurance contract was entered into, Acceptance was one of the debtor's subsidiaries. The contract does not limit the term subsidiaries to only those companies which provide multi-peril crop insurance, and even if it did, Acceptance wrote some multi-peril crop insurance business and retained some risk from its crop business. This would make Acceptance a subsidiary under the contract regardless of whether the contract was limited to only those subsidiaries which wrote multi-peril crop insurance. Thus, Acceptance is included in the definition of "Company."

The contract provides that "[t]he Company will pay the Reinsurer the payment due under the reinsurance contract." Because "Company" encompassed Acceptance, the reinsurance contract obligated it to pay the insurance premium to Granite Re. Although Acceptance did not separately sign the reinsurance contract, its parent did sign on its behalf and Acceptance ratified the signature of the debtor's representative on the asset purchase agreement and the ancillary agreements, which included the reinsurance contract. Thus, we conclude that Acceptance is a party to the MPCI reinsurance contract.

## **Granite Re is Entitled to the Entire $15 Million Reinsurance Premium.**

Although insurance policies must be construed as a whole and their words given their ordinary, not technical, meaning to achieve a practical and fair interpretation, where the meaning of terms in an insurance policy is susceptible to two interpretations, the one favoring the insured is adopted. *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987). However, the mere fact that parties disagree on the meaning of terms does not establish ambiguity. *Id.* There must be real ambiguity in the terms of the policy. "A strained or unreasonable construction of the language used, where there is no real ambiguity, should not be indulged in. And it is well settled that if there is no ambiguity in the contract there is no right or duty on the part of the court to write a new contract of insurance between the parties." *Stover v. State Farm Mut. Ins. Co.*, 189 N.W.2d 588, 591 (Iowa 1971).

The MPCI reinsurance contract is not ambiguous with respect to the contract's term and premium. The contract defines its term: "[T]his Contract shall become effective as of July 1, 2000 and shall remain in full force and effect with respect to all Covered Business risks in force or attaching from that date through June 30, 2005." There is nothing ambiguous about this provision. There is no contract provision which provides for an early termination, and no indication that either party can terminate the contract prior to June 30, 2005. Therefore, we are left with a firm conviction that the contract term begins on July 1, 2000 and ends on June 30, 2005 with no possibility for early termination by either party.

In addition, the contract unambiguously states that its premium is $15 million payable over five years. The debtor and Acceptance have the option of paying the contract premium in installments, but are not required to do so. The contract does not indicate that the installment payments are yearly renewal premiums or that the debtor may opt out of the contract to avoid paying any of the installments.

11

Finally, the contract provided a maximum of $40 million in coverage plus $9 million in indemnity coverage for five years regardless of the year in which the losses occurred. The fact that the contract provided a cumulative $40 million in coverage rather than provide $40 million coverage *per year* indicates that the parties intended the contract to have a fixed five-year term rather than a renewable one-year term. All of these provisions unambiguously indicate that Granite Re and the debtor intended the contract to provide $40 million of coverage for 5 years, plus legacy coverage, for a $15 million premium.

Again, there is no need to consider extrinsic evidence in order to determine the meaning of the contract because the contract is unambiguous on its face. However, the extrinsic evidence likewise indicates that the parties intended to provide coverage for the term of 5 years at a cost of $15 million with no exceptions for early termination or a loss of business. The debtor and Acceptance base their argument that the parties intended the contract to provide coverage renewable on a yearly basis on Alan Symons's letter to the Indiana Board of Insurance. The letter states that "[Granite Re] will be paid $3,000,000 per year for the duration of the risk. [Five year maximum]." However, Symons also states in the same letter that "[Granite Re] will reinsure $40 million of risk for MPIC layer 140% to 150% for five years." When the letter is read in its entirety, it confirms that the parties intended to create a five-year contract with a $15 million premium, with a $3 million minimum payment due per year. Thus, we conclude that the bankruptcy court's consideration of extrinsic evidence as to whether the contract premium was due on an annual basis was in error because the contract contains no ambiguity for which extrinsic evidence is needed to resolve, and in any case, its interpretation of that extrinsic evidence was clearly erroneous

## The Bankruptcy Court's Denial of Summary Judgment Is Not Appealable After Trial on the Merits.

"[T]he denial of summary judgment is interlocutory in nature and not appealable after a full trial on the merits; judgment after a full trial on the merits supersedes earlier summary judgment proceedings." *Bakker v. McKinnon*, 152 F.3d 1007, 1010 (8th Cir. 1998).

The debtor and Acceptance ask us to review the bankruptcy court's denial of their summary judgment motion. We cannot review the bankruptcy court's decision on summary judgment with respect to those issues which it decided after trial on the merits because the judgment after trial supercedes the denial of summary judgment. However, as part of their appeal from the final judgment we can review the issue of frustration of purpose as additional grounds for reversal argued by the debtor and Acceptance.

## The Purpose of the Contract Was Not Frustrated.

The Restatement (Second) of the Law of Contracts § 265 describes frustration of purpose as:

> Where, after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his remaining duties to render performance are discharged, unless the language or the circumstances indicate the contrary.

Iowa law is in accord with the Restatement and requires three circumstances to be met prior to discharge due to supervening frustration: 1) the purpose that is frustrated must have been a principal purpose of that party in making the contract; 2) the

frustration must be substantial; and 3) the non-occurrence of the frustrating event must have been a basic assumption on which the contract was made. *Mel Frank Tool & Supply, Inc. v. Di-Chem Co.,* 580 N.W.2d 802, 806-07 (Iowa 1998).

The debtor and Acceptance claim that one of two events frustrated the purpose of the contract: 1) the losses sustained by American Growers in its multi-peril crop insurance business; or 2) the Nebraska Department of Insurance's supervision of American Growers. Neither event frustrated the purpose of the contract. First, American Growers' losses did not frustrate the purpose of the contract because the debtor anticipated that it might sustain crop insurance losses. The anticipation of these losses compelled the debtor to reinsure its potential losses with Granite Re in the MPCI reinsurance contract. The debtor cannot now claim that the occurrence of substantial crop losses frustrated the purpose of the contract because this is precisely the reason the debtor entered into the contract with Granite Re. Because the reinsurance contract anticipated potential crop losses, its purpose cannot be frustrated by the occurrence of these losses.

Second, the purpose of the contract is not frustrated because of the Nebraska Department of Insurance's supervision of American Growers. The losses American Growers experienced in its multi-peril crop insurance business caused the Department of Insurance to place American Growers under supervision due to inadequate capital levels. American Growers could have avoided being placed in supervision if it had maintained adequate levels of capital, but it failed to do so. The parties to the reinsurance contract should have been aware that failure to abide by the insurance regulations of Nebraska would induce the Department of Insurance to take those actions which Nebraska law allows, including entry into supervision and liquidation. This is a reasonably foreseeable event which the contract should have anticipated and is the fault of the insured party, American Growers, for maintaining inadequate capital. Thus, it is not grounds to void the reinsurance contract due to frustration of purpose.

# CONCLUSION

1. We reverse the disallowance of Granite Re's claim in case number 05-80059.

2. We affirm the bankruptcy court's judgment that dismissed the debtor's complaint against Granite Re in adversary proceeding number 06-8115.

3. We affirm the bankruptcy court's judgment in favor of Acceptance and against Granite Re in adversary proceeding number 06-08015 to the extent it found Acceptance liable for the insurance premium but reverse the judgment to the extent it found that liability to be zero.

4. We dismiss the debtor's and Acceptance's appeal from the bankruptcy court's denial of summary judgment for lack of jurisdiction.

---